*942 OPINION OF THE COURT
Peter Tom, J.
Before the court are four nonpayment proceedings which were tried jointly.
The following unusual facts unfolded during the course of this trial which reflect the emergency shortage of decent and affordable housing in this city. This condition has resulted in illegal profiteering by owners of leaseholds of regulated apartments and has forced subtenants, faced with the housing crisis, to live under deplorable conditions.
Petitioner and his wife moved into the subject apartment in 1947. In 1950 the couple moved out because the condition of the apartment, as averred to by petitioner himself, was in such disrepair that they could no longer live there. However, petitioner subleased the apartment in issue to undertenants. It is obvious that petitioner felt that what was not good for the goose was good for the gander.
The apartment consists of five partitioned rooms, each measuring approximately 10 feet by 10 feet, a kitchen and a bathroom. Petitioner subletted each of the rooms to a subtenant. Petitioner has been operating a small rooming house business from his apartment for the past 36 years without the consent of the owner.
The court is not sure whether petitioner partitioned the rooms himself or the apartment was originally constructed that way.
The condition of this building continued to deteriorate as the years went by. The owner, who had serious economic problems with this property, provided little or no services to the building. The owner’s neglect was probably the reason, as surmised by the court, why the owner had no knowledge of petitioner’s illegal sublets throughout the years.
Before the winter of 1980, the owner abandoned this property. The tenants ran the building with whatever funds they had until July 1981 when the city, under the auspices of the Department of Housing Preservation and Development (HPD), took over this building. The city, on October 1, 1986, leased this building to the Tenants’ Association which was formed in the summer of 1986.
The four respondents in these proceedings are subtenants of petitioner. They stopped paying rent in October 1986 when petitioner demanded a large rent increase which they felt was unreasonable and excessive.
*943 When respondents refused to pay the rent increase petitioner served each of them with a written notice to vacate. On the night of October 30th petitioner went to the apartment with 4 to 5 intimidating individuals to attempt to enforce the vacate order. They threatened the respondents, removed the front door of the apartment, turned off the electricity for the apartment, severed the gas line and removed the stove.
As a result of this incident one of the subtenants vacated her room. The remaining four subtenants repaired the damages and decided to stay.
Petitioner then brought on these four nonpayment proceedings against respondents. Respondents counterclaimed for rent overcharges, triple damages, breach of the warranty of habitability, illusory tenancy and harassment.
The parties stipulated that the rent paid by petitioner to the landlord was $146 per month before October 1986 and $292 per month after October 1986. It is further stipulated that: petitioner charged respondent Rouse, a subtenant for 25 years, a monthly rent of $113 before October 1986 and $173.30 after October; respondent Smith, a subtenant for 11 years, was charged a monthly rent of $138.66 before October 1986 and $173.33 after October; respondent Muhammad, a subtenant for nine years, was charged a monthly rent of $106 before October 1986 and $151.66 after October; and respondent Selah, a subtenant for six years, was charged a monthly rent of $130 before October 1986 and $151.66 after October.
The total monthly rent collected by petitioner from respondents immediately before October 1986 was in the sum of $487. This sum does not include the monthly rent of approximately $120 which was paid by the subtenant who vacated the premises in October. Since petitioner paid a monthly rent of only $146 and an average utility bill of approximately $70 per month, he was overcharging the occupants prior to October 1986 approximately 200% above the legal rent each month. If the court were to attempt to calculate petitioner’s profit margin for 36 years the final amount could easily reach into six figures. It is ironic that petitioner, a tenant with no financial commitment to this property, made a steady profit from this apartment for 36 years while the owner who had a continued deficit with this property had eventually abandoned it.
The petitions which seek to recover the legal rent plus overcharges must be dismissed for the following reasons:
*944 That portion of the petitions for rent which exceeds the legal rent for this apartment is dismissed as being illegal.
Rent gouging is a crime and is classified as a class B misdemeanor. New York Penal Law § 180.55 provides: "A person is guilty of rent gouging when, in connection with the leasing, rental or use of real property, he solicits, accepts or agrees to accept from a person some consideration of value, in addition to lawful rental and other lawful charges, upon an agreement or understanding that the furnishing of such consideration will increase the possibility that some person may obtain the lease, rental or use of such property, or that a failure to furnish it will decrease the possibility that some person may obtain the same.”
It would make a travesty of justice if petitioner was permitted to collect illegal rent overcharges in this court which was created as a central forum in 1972 to maintain and upgrade housing standards and to correct the very abuses which have been committed in these cases.
That portion of the petition for rent which does not exceed the legal rent for this apartment is also dismissed for failure of petitioner to make a proper demand for rent pursuant to RPAPL 711 (2).
The demand for rent, which is a jurisdictional predicate of a nonpayment proceeding, must meet minimum requirements. The demand must inform the tenant of the particular period rent is due and the approximate good-faith sum of rent owed for the particular period. (Western Hotels Co. v Ramsay, NYLJ, Dec. 20, 1979, at 10, col 4 [App Term, 1st Dept]; Schwartz v Weiss-Newell, 87 Misc 2d 558.)
Petitioner concedes that he did not make a demand for rent as against respondent Smith. As to the other three respondents, petitioner demanded an amount of rent which well exceeded the legal rent for this apartment. The exorbitant amount of rent demanded by petitioner does not constitute a good-faith sum of rent owed but rather was calculated to defraud the respondents and the petitions must be dismissed. (RPAPL 711 [2]; Solack Estates v Goodman, 102 Misc 2d 504; Micholos v Tsekoura, NYLJ, Mar. 19, 1985, at 6, col 4 [App Term, 1st Dept]; Simon v Johnson, NYLJ, Feb. 5, 1986, at 14, col 5 [App Term, 2d & 11th Jud Dists].)
As to respondents’ counterclaims for rent overcharges and triple damages, the court cannot invoke the applicable rent overcharge and triple damages provisions of the New *945 York City Rent and Rehabilitation Law or Rent Stabilization Law of 1969 since a building taken over by the city in an in rem proceeding is exempt and removed from the protection of rent control and rent stabilization. (Administrative Code of City of New York § Y51-3.0 [e] [2] [f]; § YY51-3.0 [a] [1] [a].)
Although the provisions of the rent laws regarding rent overcharges are not applicable in this case, the court sustains respondents’ counterclaim for rent overcharge as mandated by the public policy of this State regarding rent regulations.
The Emergency Housing Rent Control Law (L 1946, ch 274) was enacted in the State of New York in 1946 as a result of a housing shortage caused by the return and settlement of many war veterans in this State after World War II. All housing accommodations completed prior to February 1, 1947 were subject to rent control. The intention of the Emergency Housing Rent Control Law was to provide owners with a fair return for their investment and to protect tenants including protection from unreasonable rent charges.
In 1969, the New York City Council recognized the continued housing shortage and the need to further regulate the housing stock of the City of New York. The Rent Stabilization Law was enacted. All housing accommodations which were built from February 1, 1947 through March 10, 1969 were subject to rent stabilization. Again, the Rent Stabilization Law of 1969 was designed to prevent the exaction of unjust and oppressive rents upon tenants.
To permit petitioner in these proceedings to illegally overcharge respondents and keep the overcharges would be a violation of this policy. To permit this, the court would, in effect, condone this illegal activity and invite further abuses in our housing market.
Further, petitioner should not be allowed to charge more than what he paid for rent to the landlord and reasonable expenses for this apartment since he has breached the sublease agreement by failing to provide essential services. Petitioner, a lessor, is liable by privity of contract to respondents for the proper maintenance of this apartment in a habitable condition.
Pursuant to Real Property Law § 235-b, a lessor shall be deemed to warrant that the leased premises are fit for human habitation and that the occupants shall not be subject to any conditions which would be dangerous, hazardous or detrimental to their life, health, or safety. The obligation of tenants or *946 subtenants to pay rent is contingent upon the landlord or lessor in properly maintaining the premises in a habitable condition. (Park W. Mgt Corp. v Mitchell, 47 NY2d 316.)
The evidence in this case shows that respondents lived in deplorable conditions throughout the years, and that petitioner was informed of the needed repairs and failed to make them. Petitioner has ignored all complaints by respondents regarding the condition of this apartment. He would appear at the premises weekly only to collect rent. He did not leave his home address or phone number with respondents. Whenever one of the respondents would complain about needed repair, petitioner would inform him that he is not responsible for the repairs and that he should go to HPD and complain.
Respondents testified that the essential services to this building prior to 1980 was almost nonexistent. After the owner abandoned this building in 1980 there was no heat or hot water for that entire winter. The apartment had cracks and holes in the walls and ceilings. There were severe water leaks for extensive periods of time.
Respondent Smith testified that there was a water leak in the bathroom which lasted for 6 to 7 weeks a year or two ago. He had to use an umbrella each time he used the toilet for that period of time. Respondent Selah used a plastic bag to cover his head when he used the toilet. Respondent Muhammad testified that the main problem with the apartment was the lack of heat and hot water which would cease for weeks at a time during each winter.
The city has made substantial repairs in this building and the condition has improved.
The court in determining the amount of overcharges for which petitioner is liable to the respondents will apply the six-year Statute of Limitations for an action based on a contract since a lease agreement is both a contract and a conveyance of an estate or interest in real property. (1 Rasch, New York Landlord and Tenant — Summary Proceedings § 2 [2d ed]; CPLR 213 [2]; White v Dumont, NYLJ, Dec. 4, 1980, at 10, col 4 [App Term, 1st Dept]; Wolf v Wohl, 103 Misc 2d 1044 [App Term, 2d Dept].)
A claim for breach of the warranty of habitability is also governed by the six-year Statute of Limitations. (CPLR 213 [2]; Sprague v Luna Park Co-op, 83 AD2d 877 [2d Dept]; Korn v Landey, NYLJ, Dec. 13, 1976, at 12, col 3 [App Term, 1st Dept].)
*947 The court has calculated the overcharges collected by petitioner from respondents between October 1980 through September 1986 to be in the sum of $14,720. This sum includes consideration and credit to petitioner for the utility bills he paid for this apartment and a surcharge of 10% of the legal rent for the use by respondents of the furnishings petitioner owned in the apartment.
The court shall deem respondents’ counterclaim for triple damages as a claim for punitive damages.
The court further finds that imposition of punitive damages against petitioner is warranted under the facts of these proceedings.
The Court of Appeals has approved an award of punitive or exemplary damages in cases where the defendant’s conduct, aimed at the general public, evinces "a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.” (Walker v Sheldon, 10 NY2d 401, 405; 111 E. 88th Partners v Simon, 127 Misc 2d 74; Hurkin v Mazzola, NYLJ, June 2, 1978, at 6, col 1 [App Term, 1st Dept].) In the Walker case, the Appellate Division, First Judicial Department, in its decision which the Court of Appeals affirmed, granted an award of punitive damages based on a finding that defendants were carrying on "a virtually larcenous scheme to trap generally the unwary” (12 AD2d 456). We have the exact situation in these proceedings.
Petitioner in using the rent law which was enacted to protect tenants like himself to defraud the general public for profit has committed an act involving moral turpitude. Petitioner’s illegal act was directed at those with marginal income and who are in desperate need of housing accommodation. Petitioner has placed ads in The Amsterdam News whenever there was a vacancy in the apartment. Almost all the respondents leased their rooms through the ads in The Amsterdam News.
Petitioner in carrying out the fraudulent scheme has disregarded the law, and the safety and welfare of the undertenants for the sole purpose of making a monetary gain. Petitioner’s reprehensible conduct which was directed at the public at a time of an emergency housing shortage evinces a gross indifference to civil obligation and public welfare.
The court in imposing punitive damages against petitioner in these proceedings would be fostering the prevailing policy *948 of this State in the imposition of sanctions against violators of rent overcharges as a punishment and a deterrence. (Administrative Code § Y51-11 [d] [2]; § YY51-6.0.5.)
Punitive damages are designed not only to punish the violator but to deter him as well as others who might otherwise be prompted in committing similar acts. (Walker v Sheldon, supra, at 404.)
The court imposes punitive damages against petitioner in the sum of $12,000.
Respondents’ counterclaim for harassment is dismissed without prejudice since it is not a proper counterclaim in this summary proceeding in that it does not relate to or intertwine with petitioner’s simple action for rent. (Coronet Props. Co. v Lederer, NYLJ, Feb. 21, 1986, at 12, col 2 [App Term, 1st Dept]; Gonzalez v Torrance, NYLJ, Aug. 2, 1985, at 6, col 1 [App Term, 1st Dept].)
Further, respondents’ claim of harassment is an action alleging a prima facie tort, and being such, sufficient facts to make out such a claim must be pleaded including an allegation of special damages. (Howard v Block, 90 AD2d 455 [1st Dept]; Wehringer v Helmsley-Spear, Inc., 91 AD2d 585.) This was not done in these proceedings.
Respondents’ claim that petitioner is an illusory tenant and has forfeited his rights to this apartment is also dismissed. The court finds that the issue as to petitioner’s legal rights to this apartment should be heard in a holdover proceeding brought by either HPD or the Tenants’ Association instead of in these nonpayment proceedings.
Petitioner has violated the terms of the tenancy by subletting the apartment for many years. This violation was a deliberate and fraudulent act committed upon the City of New York. Petitioner is the one who signed on behalf of the Tenants’ Association, as its president, the interim lease for this building with HPD. The interim lease provides in paragraphs one and two that no tenant shall sublet or assign his apartment without written permission of HPD and violators will be subject to eviction proceedings. When petitioner signed this agreement he had been subletting this apartment for 36 years. Petitioner concedes that he read and fully understood the interim lease before signing it. The members of the Tenants’ Association were present at this trial and are now seeking to have him removed as president of the Association. The court will also notify HPD of these proceedings and this decision.
*949 Accordingly, the petition is dismissed and respondents’ counterclaims are granted to the extent of directing that a judgment shall be entered in favor of the respondents against petitioner in the sum of $26,720, including interest, costs and disbursements. Said sum represents rent overcharges in the amount of $14,720 and punitive damages in the amount of $12,000.
Respondents shall each submit separate judgments in an amount of the total award which shall reflect the proportionate percentage of rent paid for the apartment.